**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**October 15, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 03-40657

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

DAVID SIPE,

Defendant-Appellee.

Appeal from the United States District Court
For the Southern District of Texas

Before GARWOOD, HIGGINBOTHAM, and SMITH, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

Border Patrol Agent David Sipe was convicted after a jury trial of using excessive force and causing bodily injury in the arrest of Jose Guevara, a Mexican national attempting to enter the United States illegally. Sipe sought a new trial, complaining that the prosecution's misrepresentations and nondisclosures rendered the trial unfair. In particular, Sipe pointed to a false representation by the prosecution regarding the extent of the benefits provided by the government to three illegal aliens who testified at trial, as well as the prosecution's failure to produce exculpatory evidence in violation of its obligations under *Brady v.*

*Maryland*.[1]  In two distinct rulings the district court agreed, granting Sipe's motion for a new trial.  The district court pointed to the cumulative effect of the prosecution errors and rested its ruling on the "interest of justice" standard of Rule 33 of the Federal Rules of Criminal Procedure and the court's finding that the prosecution committed numerous *Brady* violations.

We hold that the district court did not err in granting a new trial.  Although both the government and the accused make strong arguments, we ultimately agree with the district judge who presided over this five-day trial that the prosecution violated its *Brady* duty by suppressing favorable material evidence, thereby undermining confidence in the jury's verdict.  We affirm the grant of a new trial.

I

A

On April 5, 2000, Sipe and his partner, Lorraine Gonzales, were patrolling the border between the United States and Mexico, an area near Penitas, Texas.  Two other BPAs, Christopher Cruce and James Smith, were also covering the same general area.  At approximately 4:00 a.m., both pairs of agents were alerted that a sensor alarm had been triggered in the area, and they proceeded to investigate.  A second sensor was triggered approximately twenty minutes later.  A group of twelve to fifteen aliens who were

---

[1] 373 U.S. 83 (1963).

attempting to move through the area had triggered the sensors. One of the aliens was Jose Guevara.

Because it was still dark, the agents, following standard practice, turned their large hand-held flashlights on the aliens, "lighting them up," while shouting commands in Spanish to stop and surrender. The aliens instead scattered and ran in various directions, although most quickly stopped, waiting to be taken into custody. Guevara and at least two others, however, fled to the arrizo -- an area of heavy reeds that were both dense and taller than the aliens and agents. Crouching on his knees in the reeds, Guevara remained motionless for approximately two minutes before Sipe discovered him.

What happened next is disputed. The other two aliens hiding in the reeds, Nehemias Diaz and Evarado Sanchez, became government witnesses, but only with substantial benefits.[2] According to their story, Sipe struck Guevara with his flashlight on the back of the head. They testified that Guevara did not resist or yell out and that his scalp was cut by one of the blows. Sanchez claimed that he saw Guevara squatting alone and motionless just before Sipe struck Guevara at least twice with a flashlight and that Guevara was bleeding after the blows. Diaz, who was slightly farther away from Sanchez, claims to have seen Sipe swing his flashlight three times, striking something in the reeds.

---

[2] *See infra*, Part C4.

Agent Cruce headed into the brush to assist Sipe. When Cruce was a few feet away from Sipe, he saw Sipe on top of Guevara, who was lying on the ground face down and was not struggling. Another of the agents, Agent Smith, could not see Sipe but heard him say words like "is that enough" or "have you had enough." Cruce heard movement in the brush nearby and, suspecting more aliens were hiding there, called out for them to stand up.[3] Sanchez and Diaz complied. Sipe -- saying nothing about a possible injury to Guevara – offered to escort Sanchez and Diaz to the van.

When Sipe left, Cruce and Smith found Guevara kneeling, holding the back of his head with his right hand. He was bleeding from a cut in his scalp. Smith ordered Guevara to stand up, but Guevara did not respond immediately. Rather, he appeared to have the dry heaves.[4] Cruce yelled for Sipe to return to the area.[5]

Sipe reached BPA Gonzales with Sanchez and Diaz just before Cruce called for him. According to Gonzales, Sipe appeared calm

---

[3] It bears mentioning that Agent Cruce could not see Diaz or Sanchez until they stood, even though they testified that they could see Sipe.

[4] Whether this apparent episode of "dry heaves" was real or feigned to distract the agents and allow escape to the nearby river was disputed. The injury did not prove to be more than the cut. Evidence was introduced that scalp wounds bleed profusely, and it was undisputed that Guevara was angry and attempted to protest his treatment by rubbing blood on the government vehicle, refusing the assistance of the agents, including Sipe, who was trained as a medic.

[5] At trial, conflicting explanations were offered for Cruce's apparent "anger" with Sipe. The defense suggested that Cruce bore Sipe a personal animosity and seized on the moment to put Sipe in a bad light. The prosecution suggested that Cruce was upset both because Sipe used excessive force and because he left the injured Guevara with Cruce while taking charge of two other aliens, even though Sipe had medical training. These conflicting inferences from Cruce's behavior only emphasize the materiality of the evidence withheld by the prosecution regarding the relationship between Cruce and Sipe.

4

and made no mention of any confrontation with Guevara. When Sipe returned to the brush where he had encountered Guevara, Sipe did not appear to be aware that Guevara was injured. Sipe told Cruce and Smith that he hit Guevara's leg with his flashlight because Guevara was running away from him, and that he used force to protect himself from a possible assault with a knife or other weapon when Guevara resisted.

Guevara walked to the Border Patrol vehicle. His scalp was bleeding and he was angry, refusing the offer of aid by Sipe and other agents. Sipe told Gonzales, who was at the vehicle with other aliens, that he hit Guevara both in the hip and in the head. A short time later, Guevara was taken to a doctor to have his cut sutured.

The following day, the BPA assigned Agent Garcia to work with Sipe. Sipe told Garcia that he hit an alien the night before in an effort to slow him, striking him with his flashlight on his head, the part of his body closest to him. When he was on the alien's back, he hit the alien again because the alien would not give up his hands and was resistant and uncooperative. Garcia said Sipe did not appear upset about the incident. Rather, he did not understand why he was being investigated.

B

On November 24, 2000, Sipe was indicted on one count of violating 18 U.S.C. § 242 by using excessive force. Before trial, he filed motions seeking the production of exculpatory and

5

mitigating evidence.[6]  In particular, he asked for (1) the criminal records of any witnesses in the case; (2) what benefits the government had given the aliens; (3) the names of persons interviewed by the government; and (4) all exculpatory and impeaching *Brady* and Rule 16 evidence.  The government complied by producing a number of items of evidence, including Cruce's grand jury testimony, in which Cruce stated under questioning that he did not dislike Sipe.  The United States also advised that it was unaware of any criminal convictions of any witnesses to be called at trial.  Finally, the government informed Sipe that the three testifying aliens -- Diaz, Guevara, and Sanchez -- had been allowed to remain and work in the country pending trial, but "no other promises or advantages" had been given.

The case proceeded to trial on March 19, 2001.  According to Sipe, it became evident early in the proceedings that the government's disclosure was incomplete.[7]  At trial, witnesses

---

[6] 18 U.S.C. § 242 provides, in pertinent part, that any person who, under color of law, deprives any alien of any rights, privileges, or immunities protected by the Constitution or federal law "on account of such person being an alien," shall be fined or imprisoned.

[7] Sipe provides two examples of the government's inadequate disclosure, although neither forms a direct basis of this appeal.  First, the government sought to introduce a photograph that the defense was never given.  Second, the government failed to notify the defense that, following Sipe's indictment, Border Patrol agents caught Guevara escorting two other illegal aliens.  The agents chose not to arrest Guevara when he showed them a card given to him by prosecutors.  The court found no *Brady* violation because the defense learned of the stop independently, but the court expressed its concern over the role one of the agents, Agent Mercado, played in Guevara's release.  Mercado had testified that the decision to release Guevara was based on objective guidelines, not on a desire to influence his testimony.  But the defense learned from an unknown informant that Mercado was related to Guevara's boss, Leonardo Ramirez, a known trafficker.  The prosecutors protested that there was no credible evidence

recounted the events we have detailed. In addition, BPAs Cruce, Smith, Gonzales, and Fortunato testified that during their years of service, they seldom needed to use "intermediate force" to subdue an alien or to defend themselves. They noted that all agents are taught not to strike a person's head or face unless deadly force is necessary. After a five-day trial, the jury found Sipe guilty of violating 18 U.S.C. § 242 by using excessive force.

Following the verdict, the Presentence Report became a source of controversy when it became apparent that the government had disclosed information to the probation officer that it did not disclose to the defense. Sipe was first alerted to the government's nondisclosures by a statement in the PSR indicating that Cruce disliked Sipe. Sipe immediately complained that this statement was contrary to Cruce's grand jury testimony. The government traced the source of the probation officer's statement in the PSR to a Prosecution Memorandum that was prepared by the line attorney assigned to the case. The memorandum stated in relevant part:

> Cruce admits to disliking the subject [Sipe] even before this incident. Cruce said that [Sipe] has an abrasive personality, keeps to himself, and is generally disliked by most of the other agents.

---

connecting Ramirez and Mercado, but eventually admitted that they knew about a "distant" relationship between the two men. When Mercado was recalled to the stand, he revealed that Ramirez was his uncle. Mercado testified that he had informed the two government attorneys about the relationship the week before he testified the first time.

7

Sipe moved for the production of the government's entire investigative file. After reviewing the material produced, Sipe identified four additional pieces of exculpatory or impeachment information that the government had failed to provide.

First, Sipe discovered that the government had taken several photographs of the arrest scene. Guevara himself is in the photographs, apparently posing to demonstrate where he was located in the reeds when Sipe struck him. Second, Sipe learned that Alexander Murillo, one of the government's witnesses, had a criminal history. Specifically, Murillo had been charged in the past with filing a false police report, theft, and harassment, although there had been no convictions. Third, Sipe learned that the government interviewed one Herica Rodriguez before trial. Rodriguez, one of Sipe's fellow EMT students, told government investigators that Sipe was a "nice person" and that she did not hear him make any statements suggesting that he disliked or disrespected aliens.

Finally, despite the government's written assurance to the defense that the only benefit given to the testifying aliens was permission to remain and work in the United States pending trial, Sipe learned that the aliens received numerous other benefits from the prosecutors. For example, they were given Social Security cards, paid witness and travel fees, allowed to travel to and from Mexico to visit family, permitted to travel to North Carolina to work, and allowed to use government phones to contact relatives in

8

Mexico. The failure of the government to divulge this information cast two other prosecutorial nondisclosures in a new light. First, Sipe discovered that the two aliens in the brush with Guevara, Sanchez and Diaz, who testified at trial, had been living with Guevara and his wife during the months before trial. They had testified at trial that they did not know Guevara before the fateful crossing, supporting the government's portrayal of Guevara as a poor illiterate with only one hand who was crossing in search of work, meeting up with them only by happenstance. This evidence countered defense suggestions that Guevara was not a migrant worker but a "coyote," an oftentimes dangerous transporter of illegal aliens who was engaged in leading Sanchez, Diaz, and others across the border. Relatedly, the government failed to disclose that before trial, Guevara was intercepted by Border Patrol agents in the company of illegal aliens and that the arresting agents released Guevara when he displayed a card given to him by prosecutors. Since Guevara had been granted free passage in his deal with the government, his arrest with illegal aliens was evidence that he was a transporter, as well as evidence of the extent of the government's support accorded him in order to obtain his testimony. As the defense termed it, Guevara was given a "get out of jail card."

Armed with this newly discovered evidence, Sipe supplemented his Rule 33 motion for a new trial. After a hearing, the district court granted his motion. The district judge cited two distinct

grounds for his decision: the prosecution's *Brady* violations, and the interest of justice under Rule 33. In an oral ruling from the bench, he noted that in his twenty plus years on the bench, he had never granted a Rule 33 motion. He explained:

> I don't . . . make this decision lightly. It is the Court's view that in the interest of justice, [Sipe's motion for a new trial] should be granted. And also there is a reasonable probability that had the evidence been disclosed to the Defense, the result of the proceeding would have been different . . . . And that's the standards -- those are the standards the Court has used here.

That the district court was addressing both the *Brady* contention and the fundamental fairness of the trial under Rule 33 is plain. The Judge expressed his disquiet at the withholding of the evidence concerning Cruce's stated dislike of Sipe, the effect of the government support given to the aliens upon their reliability, and their evolving testimony. Moreover, the trial court found that their trial testimony at times was not only contrary to statements they made to the government before the benefits were given, the testimony was also challenged by the physical fact that Diaz and Sanchez could not in all likelihood have seen Sipe and Guevara through the dense canebrake. Indeed, the court asked at trial, "How could you -- how could people have really seen what was going on here . . . ?" These discrepancies stood in stark contract to the unchallenged fact that Sipe had made hundreds of arrests as a border patrol agent without complaint and

10

the complete absence of evidence that Sipe had previously used excessive force.

Specifically with regard to Sipe's *Brady* claim, the trial court focused on five pieces of withheld evidence: (1) the statement in the Prosecution Memorandum regarding Cruce's dislike for Sipe; (2) documentation concerning the prior criminal history of Alexander Murillo, a government witness; (3) a summary of an interview with Rodriguez, who stated that Sipe was a "nice person" who had not, to her knowledge, evidenced disrespect for aliens; (4) information regarding additional benefits provided by the government to the testifying illegal aliens; and (5) the photographs in which Guevara reenacts his actions the night of his capture. The court ultimately concluded that this evidence was improperly withheld and that a new trial was justified.

II

On appeal, the government focuses exclusively on the district court's *Brady* determination. The government contends that none of the information withheld from Sipe constitutes *Brady* material because it was not favorable, was not withheld, and was not material. In addition, the government asserts that, even if some or all of the evidence is *Brady* material, its cumulative effect does not undermine the jury verdict because none of the evidence bears directly on the central issue in the case -- whether Sipe used excessive force.

11

Although we recognize that this is an extremely close question, we agree with the district court that the prosecution violated its duty under *Brady* to disclose exculpatory information. We are particularly troubled by the prosecution's affirmative misrepresentation concerning the scope of the benefits provided to the testifying aliens and its failure to divulge evidence that its star witness, Agent Cruce, personally disliked Sipe. While the record unquestionably contained significant evidence of Sipe's guilt, the prosecution's withholdings prevented Sipe from exposing significant weaknesses in the government's case at every turn. Even if none of the nondisclosures standing alone could have affected the outcome, when viewed cumulatively in the context of the full array of facts, we cannot disagree with the conclusion of the district judge that the government's nondisclosures undermined confidence in the jury's verdict. We find no error in the grant of a new trial under these facts.

A

In *Brady v. Maryland*, the Supreme Court explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[8]  To establish a *Brady* violation, a defendant must make three showings: "The evidence at issue must be

---

[8] *Brady*, 373 U.S. at 87.

12

favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."[9]

The final prong of this test involves determining whether the concealed evidence is material.

> [T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[10]

When there are a number of *Brady* violations, a court must analyze whether the cumulative effect of all such evidence suppressed by the government raises a reasonable probability that its disclosure would have produced a different result.[11]

"The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state."[12]  Thus, "when the undisclosed evidence is merely cumulative of other evidence [in the record], no *Brady* violation

---

[9] *Strickler v. Green*, 527 U.S. 263, 281-82 (1999).

[10] *Id*. at 290 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995)).

[11] *Kyles*, 514 U.S. at 421-22 (1995); *United States v. Freeman*, 164 F.3d 243, 248 (5th Cir. 1999).

[12] *Smith v. Black*, 904 F.2d 950, 967 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992).

occurs."[13]  Similarly, when the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence generally is not found to be material.[14] Conversely, if the impeaching evidence "would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material."[15]  However, the State bears no responsibility to direct the defense toward potentially exculpatory evidence that is either known to the defendant or that could be discovered through the exercise of reasonable diligence.[16]

B

In general, we review a denial or grant of a criminal defendant's motion for new trial for an abuse of discretion.[17] There is some confusion in our circuit, however, regarding whether we apply an abuse of discretion standard when a new trial is granted because of *Brady* violations.  In some cases, we have

---

[13] *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996).

[14] *Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994).

[15] *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989).

[16] *Rector v. Johnson*, 120 F.3d 551, 558-59 (5th Cir. 1997).

[17] *Pryor v. Trane Co.*, 138 F.3d 1024, 1025-26 (5th Cir. 1998); *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997)

conducted a *de novo* review,[18] while in others we have asked only whether the district court abused its discretion.[19]  Our sister circuits are equally divided on the subject.

The confusion stems in part from the mixed nature of the *Brady* inquiry.  Whereas we typically analyze legal issues *de novo*, a *Brady* determination is inevitably a contextual inquiry, involving questions of both law *and* fact.  Moreover, it is intimately intertwined with the trial proceedings: because the court must judge the effect of the evidence on the jury's verdict, the *Brady* decision can never be divorced from the narrative of the trial.  In addition, the court must consider not simply the withheld evidence in isolation, but also the quantity and quality of other evidence in the record.

In comparison to a district court ruling on a motion for new trial, an appellate court reviewing a *Brady* violation is at an inherent disadvantage.  Gauging the effect that undisclosed

---

[18] *See, e.g., United States v. Runyan*, 290 F.3d 223, 246 (5th Cir. 2002); *United States v. Hughes*, 230 F.3d 815, 817 (5th Cir. 2000); *United States v. Gonzales*, 121 F.3d 928, 946 (5th Cir. 1997); *United States v. Dixon*, 132 F.3d 192, 199 (5th Cir. 1997); *see also United States v. Lee*, 88 Fed.Appx. 682 (5th Cir. 2004) (unpublished).  Each of these cases relies for support on either *United States v. Green*, 46 F.3d 461, 464 (5th Cir. 1995), or *Felder v. Johnson*, 180 F.3d 206, 212 (5th Cir. 1999).  Both *Green* and *Felder* state that we review *Brady* determinations *de novo*, but both cases arose in a distinct procedural posture: *Green* did not involve a motion for a new trial, and *Felder* was a habeas case.

[19] *See, e.g., Burton v. United States*, 237 F.3d 490, 493 (5th Cir. 2000); *United States v. Cisneros*, 112 F.3d 1272, 1277-78 (5th Cir. 1997); *United States v. Shugart*, 117 F.3d 838, 847-48 (5th Cir. 1997); *United States v. Williams*, 985 F.2d 749, 757 (5th Cir. 1993); *United States v. Burns*, 668 F.2d 855, 859-60 (5th Cir. 1982); *see also United States v. Nix*, 84 Fed. Appx. 415 (5th Cir. 2003).

15

evidence might have had on the outcome of the trial is difficult in any event, but it is made more so when it must be based on a cold record. The district judge, by contrast, has at least had the opportunity to hear the testimony at trial firsthand, view the demeanor of the witnesses, observe the ebb and flow of the evidence at trial, and evaluate the strengths and weaknesses of the government's case. When, as here, the balance of evidence presented is close, the outcome of the case will often hinge on a subjective and personal evaluation of the evidence and the witnesses. In such a context, some degree of appellate deference makes sense.

We think there is a reconciling theme in our facially competing approaches to *Brady*-based new trial questions -- adhering to decisions that examine the *Brady* question anew, while acknowledging that we must proceed with deference to the factual findings underlying the district court's decision. This gives play to the trial court's superior understanding of the trial, evidence, and witnesses, while reviewing the ultimate constitutional question afresh. It also recognizes that in the new trial context concerns respecting finality are less strong. We turn now to the evidence at issue in this appeal.

C

In assessing the *Brady* evidence, we must place the facts that form the substance of our analysis in the context of the specific

16

elements of the charged offense.  Sipe was charged and convicted of violating 18 U.S.C. § 242, which prohibits an individual acting under color of law from willfully depriving any person of rights protected by the Constitution or laws of the United States.

At Sipe's trial, the district court properly instructed the jury on the elements of a § 242 violation, including the element of willfulness.[20]  The Court instructed the jury that an act is done willfully if "it is done voluntarily and intentionally and with the specific intent to do something the law forbids."  The Court further described willful conduct as conduct engaged in "with a bad purpose or evil motive to disobey or disregard the law."  The Court defined specific intent as a knowing violation of the law in which the defendant purposefully intends to violate the law.[21]

It is a given that the jury was persuaded beyond a reasonable doubt that Sipe willfully violated Guevara's legal rights.  The inquiry with which we are presented, however, is whether the cumulative effect of the evidence withheld by the government at trial could reasonably be taken to put the whole case in such a

---

[20] The four elements contained in the Court's jury instruction are as follows: (1) the defendant acted under color of law; (2) the defendant's conduct deprived Guevara of a constitutional right; (3)  the defendant used force that was not reasonably necessary under the circumstances; and (4) the defendant acted willfully.

[21] We have explicitly approved the phrasing of this jury charge, noting that it comports with the Supreme Court's teaching in *Screws v. United States* that the term "willfully" implies conscious purpose to do wrong and intent to deprive another of a right guaranteed by the Constitution or other federal law. *United States v. Garza*, 754 F.2d 1202, 1210 (5th Cir. 1985)(citing *Screws v. United States*, 325 U.S. 91, 101-7 (1945)).

different light as to undermine confidence in the verdict.  If so, Sipe is entitled to a new trial.

The Court also instructed the jury that conviction could rest only on a finding beyond reasonable doubt that Sipe used force that was "greater than the force which would have been reasonably necessary under the circumstances to an ordinary and reasonable officer in the same circumstances."[22]  This instruction demonstrates the essentially objective nature of the test for ascertaining whether unreasonable force was used – objective in the sense that it is informed by *all the facts and circumstances*.

We face a similar inquiry regarding the element of willfulness.  With these considerations in mind, we now examine each item of evidence withheld by the government.

1

The first item of evidence at issue -- the Prosecution Memorandum revealing Cruce's dislike for Sipe -- is perhaps the most difficult to evaluate.  The district court easily concluded that the government suppressed the information and that it was favorable to Sipe.  The court also found the Memorandum to be material, at least when viewed collectively with the other items of

---

[22] This instruction comports with clearly established law in this circuit regarding use of excessive force under § 242.  *See Bazan v. Hidalgo Co.*, 246 F.3d 481, 487 (5th Cir. 2001) ("It is clearly established law in this circuit that in order to state a claim for excessive force in violation of the Constitution, a plaintiff must allege (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable.").

18

undisclosed evidence.[23]  As we will explain, there is a good argument that the government violated its duty under *Brady* by failing to disclose this information to Sipe, but we rest on the easier conclusion that its prejudicial force is found in the cumulative effect of the government's nondisclosures.

The evidentiary value of the Prosecution Memorandum lies in its relationship to Cruce's testimony before the Grand Jury.  The Prosecution Memorandum states:

> Cruce admits to disliking the [Sipe] even before this incident.  Cruce said that [Sipe] has an abrasive personality, keeps to himself, and is generally disliked by most of the other agents.  Cruce said that, while he never witnessed the subject hit anyone before, he is often verbally abusive and bullish toward the aliens.

During his Grand Jury testimony, however, Cruce presented a different view.  When asked about his relationship with Sipe, and in particular whether he and Sipe would have a cup of coffee together, Cruce responded:

> No.  I really -- honestly, I don't get along with him that well.  He kind of has an abusive personality, and I just have never gotten along with him.  Not that I dislike him, but he's not somebody I associate with.

The district court was persuaded that the Prosecution Memorandum contradicted this statement, discrediting the government's argument that the statement in the Prosecution Memorandum was an

---

[23] The district court did not specify whether it considered the Memorandum to be material by itself.

19

inarticulate statement of the drafting attorney's impressions of Cruce.[24]

The government disputes the district court's decision on several grounds. First, the government argues that Sipe knew of or could have discovered with reasonable diligence that Cruce disliked him. Second, the government contends that the Prosecution Memorandum is not truly favorable to Sipe. Third, the United States urges that the Memorandum is merely cumulative of other information given to Sipe, such as the Grand Jury testimony itself. Relatedly, the government contends that Sipe had an adequate opportunity to cross-examine Cruce on the topic. Finally, the government argues that even if the Prosecution Memorandum otherwise satisfies the *Brady* requirements, its revelation of Cruce's possible bias is too insignificant to create a reasonable probability that the verdict would be different. We are not persuaded.

The government's argument that Sipe knew of or could have discovered this information through reasonable diligence is disingenuous at best. Sipe, it must be remembered, was provided only with Cruce's Grand Jury testimony -- testimony in which Cruce explicitly states, under oath, that he does not dislike Sipe. Even though Cruce criticizes Sipe in that testimony, his comments reveal only that he and Sipe were not personal friends. They did not

---

[24] The government does not argue that the court clearly erred in finding that Cruce made the statement in the Prosecution Memorandum.

indicate that Cruce harbored any personal dislike of Sipe. Indeed, the government knew that Sipe believed that he and Cruce got along: Sipe told prosecutors that he had "no problem with any other Border Patrol Agents," including Cruce, Gonzales, and Smith. The government cannot reasonably argue that Sipe either knew of Cruce's dislike or should have discovered it through reasonable diligence.

We similarly reject the government's argument that the Prosecution Memorandum was not favorable to Sipe. The Memorandum suggests that Cruce's testimony may have been motivated by personal animosity, and thus provides Sipe with a source for impeaching Cruce for bias. Indeed, the Memorandum might also have helped Sipe impeach other government witnesses because it indicates that Sipe "is generally disliked by most of the other agents."

The government responds that if Sipe had cross-examined Cruce regarding his dislike for Sipe, then the government could have explored the basis of Cruce's dislike and introduced evidence that Sipe was disrespectful toward aliens. The Prosecution Memorandum, then, could not truly be deemed favorable evidence because it would be inculpatory as well as exculpatory.[25] The government, however,

---

[25] There is support for the view that evidence that is both exculpatory and inculpatory does not qualify as "favorable" under *Brady*. *See, e.g., United States v. Polland*, 994 F.2d 1262, 1267 (7th Cir. 1993) (holding that *Brady* does not require disclosure of evidence that is "more inculpatory than exculpatory"); *United States v. Gonzales*, 90 F.3d 1363, 1369 (8th Cir. 1996) ("If the evidence is inculpatory, then *Brady* is not violated, regardless of the effect at trial of the nondisclosure."). Some courts have reached the opposite conclusion, however. *See, e.g., United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000) ("That the information withheld may seem inculpatory on its face in no way eliminates or diminishes the government's duty to disclose [exculpatory] evidence of a flawed police investigation. Furthermore, the mistakes constituted textbook examples

21

offers us nothing other than conclusory assertions to support its contention that the Memorandum would have led to the introduction of inculpatory evidence: we are not provided with any description of this alleged evidence or told what form it might have taken. That said, the problem with the government's argument runs deeper. In essence, it permits the government to usurp the role of the court and unfairly limit the options of a criminal defendant. Sipe should have been allowed to decide whether to risk the introduction of such evidence; the court should have been allowed to weigh the inculpatory evidence to determine whether it would be admissible; and the jury, ultimately, should have been entitled to determine whether Cruce was truthful or biased.

We thus have little difficulty concluding that the first two prongs of the *Brady* test are satisfied here: the Prosecution Memorandum was both favorable to Sipe and suppressed by the government. Materiality, however, is more difficult to evaluate.

As a preliminary matter, we reject the government's suggestion that the Prosecution Memorandum can be casually dismissed as "cumulative" evidence. The government insists that the Memorandum is "virtually identical" to the Grand Jury testimony that the government produced to Sipe, but this argument finds little purchase in the text of the document. In the Memorandum, Cruce explicitly states his dislike for Sipe, while before the Grand

---

of impeachment evidence as to where the officers found the money.").

22

Jury, he clearly said "[n]ot that I dislike him." It is possible to explain away the differences in these statements -- and indeed the government expends considerable effort doing so in its briefs -- but such argument is properly reserved for the jury. The government's intricate explanation does not change the fact that this evidence contradicts Cruce's sworn Grand Jury testimony.[26]

We note, too, that Cruce was a key government witness. The government recognized that its case was founded largely on unsympathetic witnesses: Guevara, Diaz, and Sanchez were all intercepted by border patrol agents illegally entering the country. Guevara, the victim, had changed his description of the alleged attack many times, and in some versions, he exonerated Sipe. After the attack, Guevara was again stopped by Border Patrol agents in the company of illegal aliens, raising suspicions that he was a coyote helping aliens enter the country illegally. Other incidents further undermined Guevara's credibility: he was involved in some kind of an altercation with Agent Smith, and he had been accused of stealing a woman's bag. To complicate matters even further, the prosecutors provided the aliens with significant benefits in return

---

[26] The district court rejected the government's argument that the Memorandum recorded the transcribing attorney's mental impressions, concluding instead that Cruce actually made the statement recorded in the Prosecution Memorandum. The government does not challenge the court's finding as clearly erroneous, and we are left with two starkly conflicting statements: a statement by Cruce to prosecutors that he disliked Sipe, and a statement by Cruce to the grand jury that he did not dislike Sipe. These statements are simply not the same, as the government would have us believe.

23

for their testimony. The government itself conceded to the district court that Guevara was not a sympathetic figure, noting:

> As is usual in excessive force cases, we do not expect that sympathy for the victim will carry the jury to a conviction. He is an illegal alien who repeatedly crosses the border and has displayed a disrespect for the law. Also, he has not been candid about the theft of the woman's bag the night before the incident.

The government relied on Cruce to pull together and lend credibility to the testimony of these illegal aliens, painting him as the "best judge of what is reasonable out there." We have little doubt that his testimony was central to the jury's determination that Sipe's actions were inappropriate. Given this characterization, evidence that Cruce was personally biased against Sipe would have been valuable as an impeachment tool; it may well have affected the outcome of the case.[27]

Even so, the government insists that Sipe was "on notice" that Cruce disliked him and that Sipe could have cross-examined Cruce on the subject but "chose" not to do so. The government's argument, however, presumes that Cruce's dislike of Sipe was evident from the Grand Jury testimony and that Cruce could be impeached for bias based on the Grand Jury testimony alone.[28] As far as Sipe knew from

---

[27] The government, incidentally, has pointed to no other evidence in the record that exposed Cruce to impeachment for bias. The Prosecution Memorandum, then, may have been Sipe's only means of attacking Cruce.

[28] Similarly, the government's claim that Cruce's statements in the Prosecution Memorandum were simply "more detailed" than his grand jury testimony must be rejected. The government cites to *United States v. Villafranca*, 150 F.3d 374 (5th Cir. 2001), for the proposition that *Brady* is not violated when the

the Grand Jury testimony, if Cruce were asked at trial about his feelings toward Sipe, Cruce would simply have repeated that he did not dislike Sipe. This would only have bolstered Cruce's testimony and done nothing to undercut his credibility. The government's suggestion that the defense could have cross-examined him based on the grand jury testimony, then, is unreasonable. No defense attorney would have asked a question knowing that the answer could only harm his client. Even if Sipe was in some sense "on notice" that Cruce did not like him, Sipe was unable to use this suspicion at trial.

Most significantly, it appears from our review of the record that Sipe did not possess other information with which to impeach Cruce's credibility. Evidence of Cruce's dislike, therefore, would have provided Sipe's *only* avenue of impeachment, and the evidence thus takes on added importance. In cases such as this, we have been more likely to find that the withheld evidence constitutes *Brady* material.[29]

The government offers one final reason why Sipe should have discovered Cruce's dislike: the two men were personal acquaintances. Sipe cites to two Fifth Circuit cases, *United*

---

government fails to provide a more detailed version of a witness's testimony, at least when the defendant has the opportunity to cross-examine the witness on the subject. Here, however, the Prosecution Memorandum was not simply more detailed; it contradicted a portion of Cruce's sworn grand jury testimony.

[29] *See, e.g.*, *United States v. Hughes*, 230 F.3d 815, 820-21 (5th Cir. 2000) (finding suppressed evidence to be immaterial because the witness's testimony did not go untested at trial and was impeached on various grounds).

*States v. Nixon*[30] and *United States v. Fogg*,[31] for the proposition that a court may assume that information is known or available to a defendant when he has a personal relationship with the individual who possesses the information. Neither case supports the government's argument. In *Fogg*, we held that the defendant should have discovered the grand jury testimony of two witnesses, in part because they were acquaintances. However, *Fogg* stressed the defendant's "close relationship" with the two witnesses. In the case at bar, Cruce's statements -- both in the Prosecution Memorandum and in his grand jury -- reveal that Sipe and Cruce were not close. *Nixon* is similarly inapposite. In *Nixon*, we concluded that the defendant "knew or should have known" that the government had helped one of the government's witnesses by intervening in a friend's criminal prosecution. Our conclusion may have been based on the defendant's personal relationship with the witness, although we did not say so explicitly. Even assuming that the relationship was important to our holding, the connection between the defendant and the witness in *Nixon* was much closer than that between Sipe and Cruce, who, again, "did not associate" with each other. In any event, it seems inappropriate on the facts of this case to presume that Sipe recognized Cruce's dislike simply because they were

---

[30] 881 F.2d 1305 (5th Cir. 1989).

[31] 652 F.2d 551 (5th Cir. 1981).

26

acquaintances, particularly when Cruce made a sworn statement to the contrary.

After all, Cruce's testimony was not the only or even the most important evidence offered against Sipe.  In addition, the Memorandum provided impeachment evidence which the jury may have chosen not to credit.  Given these facts, it is difficult to assert with confidence that the outcome of the trial would have been different had the Memorandum alone not been withheld.

But this is only the beginning of the inquiry, not its end. Materiality does not turn on the Memorandum's effect in isolation. With a number of alleged *Brady* violations at issue, we must determine whether the "cumulative effect of all such evidence suppressed by the government ... raises a reasonable probability that its disclosure would have produced a different result."[32]  As suggested earlier, there is a stronger case that Cruce's dislike is material when viewed cumulatively with other impeachment evidence.

2

The second item of withheld evidence relates to the criminal history of one of the government's testifying witnesses, Alexander Murillo.  Murillo was a classmate of Sipe's who testified that Sipe told him during a smoking break that Sipe "hit a tonk over the head

---

[32] *Kyles*, 514 U.S. at 421-22.

with his flashlight."[33]  According to Murillo, Sipe admitted that the alien was not armed and joked about the incident.  Following trial, Sipe learned that the prosecution failed to produce information regarding four incidents in Murillo's past:

1.  On May 1, 1991, Murillo was found not guilty of submitting a false police report;

2.  In 1997, he was charged with harassment, although charges against him were dismissed on September 3, 1997;

3.  On May 30, 2000, charges for driving with a suspended license were dismissed; and

4.  On November 2, 1994, Murillo received a deferred adjudication for misdemeanor theft.

The government contends that Murillo's brushes with the law are immaterial under *Brady*.  The government makes two arguments: first, that the acquittal and deferred adjudication are inadmissible and therefore not material; and second, that even if they are admissible, they are immaterial given the corroborating evidence in the record, the insignificance of the criminal activity for impeachment purposes, and their irrelevance to the issue of whether Sipe used excessive force.

---

[33] Sipe explained that "tonk" is the sound heard when a "wetback" is hit over the head with a flashlight.  Sipe also said that the alien had "gotten too big for his britches."

Evidence may be material under *Brady* even though it is inadmissible.[34] When assessing the materiality of inadmissible evidence, we apply the general *Brady* test and "ask only . . . whether the disclosure of the evidence would have created a reasonable probability that the result of the proceeding would have been different."[35] Because of the requirement that the outcome of the proceeding be affected, we often consider whether the suppressed, inadmissible evidence would have led to admissible evidence.[36]

As a preliminary matter, the government is correct that Murillo's criminal history would have been inadmissible under Rule 609 of the Federal Rules of Evidence. In certain circumstances, Rule 609 allows evidence of a witness's criminal convictions to be admitted in order to attack the witness's credibility,[37] but Murillo

---

[34] *Spence v. Johnson*, 80 F.3d 989, 1005 n.14 (5th Cir. 1996).

[35] 180 F.3d 206, 212 (5th Cir. 1999).

[36] *Id. Feder v. Johnson*.

[37] Rule 609 provides, in pertinent part, that, for purposes of attacking the credibility of a witness:

> (1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and
> (2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.

FED. R. EVID. 609.

was not actually convicted of any of the offenses listed above. Thus, they would not be admissible under Rule 609.[38]

However, Rule 608(b) gives a district court discretion to allow questioning on a witness's prior bad acts, including those that did not result in a conviction, if they are relevant to the witness's character for truthfulness.[39]   The district court concluded that it would have "given very serious consideration" to allowing Sipe to cross-examine Murillo on three of the charges -- the false police report, harassment, and misdemeanor theft charges -- "because of the serious nature involved with regards to the witness' credibility."  Of Murillo's prior acts, however, only the false police report satisfies Rule 608(b)'s requirements.[40]   Since

---

[38] *See, e.g.*, *United States v. Parker*, 133 F.3d 322, 327 (5th Cir. 1998); *United States v. Abadie*, 879 F.2d 1260, 1267 (5th Cir. 1989); *United States v. Georgalis*, 631 F.2d 1199, 1203 (5th Cir. 1980) (holding that Rule 609 was violated when prosecutor attempted to cross-examine defendant about his deferred adjudication for felony check fraud); *United States v. Dotson*, 555 F.2d 134, 135 (5th Cir.1977) (holding that defendant truthfully stated on firearm purchase form that he had no felony convictions, given the fact that adjudication of guilt was deferred and sentence suspended on his prior offense of felony receipt of a stolen car).

[39] Rule 608(b) provides that:
> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

[40] Murillo's deferred adjudication for misdemeanor theft might conceivably satisfy Rule 608(b) as well.  It is unclear from the record whether his theft charge was a crime involving dishonesty, such as "theft by deception" or "theft

30

this charge implicates truthfulness or untruthfulness, the district court would have acted within its discretion by allowing Sipe to cross-examine Murillo on this subject.[41]

However, we cannot say that evidence of Murillo's prior acquittal puts the whole case in such a different light as to undermine confidence in the verdict, at least when viewed in isolation. In concluding otherwise, the district court focused on Murillo's importance to the government's case, noting that he "kind of pulled it all together with regards to what your [the government's] theory of the case was and the whole flavor of the case, which was: 'He did this and he did this in this fashion, because of the type of person he is. And part of the type of what he is . . . part of his personality is he has no respect for the people he deals with." However, the evidence of the false police

---

forgery." If so, then it would likely be admissible under Rule 608(b) as evidence of his truthfulness. *Compare, e.g.*, *United States v. Newman*, 849 F.2d 156, 163 (5th Cir. 1988) (holding prior convictions for "theft by deception" and "theft-forgery" were properly admitted under Rule 609(a)(2)) *with Coursey v. Broadhurst*, 888 F.2d 338, 341 (5th Cir. 1989) (holding that felony theft of cattle is not a crime involving dishonesty or false statements under Rule 609(a)(2)).

[41] A district court's discretion under Rule 608(b) is substantial. *See United States v. Farias-Farias*, 925 F.2d 805, 809 (5th Cir. 1991) (citing *United States v. Mateos-Sanchez*, 864 F.2d 232, 236 (1st Cir. 1988)).
The government responds that admitting evidence of Murillo's acquittal of filing a false police report would mislead the jury, be unduly prejudicial, or confuse the issues in violation of Rule 403. Murillo, after all, was acquitted of the false police report charge more than ten years before Sipe's trial. The government cites cases that have excluded such questioning, but each of the cases involved situations where the prosecution sought to question the defendant about his own prior alleged misconduct. In this case, by contrast, it is a government witness whose prior acquittals are in play. The government has offered us nothing to indicate that the district court would have abused its discretion by admitting Murillo's false police report.

report would have done little to undermine his testimony. Although Murillo testified about several statements that Sipe made to him, these statements were largely corroborated by other witnesses, including fellow EMT classmates Rene Garza and Sanchez and BPA Garcia. Moreover, the withheld information about which Sipe complains is an *acquittal* -- not a conviction -- and it occurred over ten years before Sipe's trial. Under the circumstances, it is difficult to see how the prior acquittal could possibly place "the whole case in such a different light as to undermine confidence in the jury verdict."[42] We will shortly return to this evidence in considering the cumulative effect of all withheld evidence.

3

The third item of disputed evidence concerns notes of an interview that the prosecution conducted with Herica Rodriguez, one of Sipe's fellow EMT students who was not called as a witness at trial. According to these notes, Rodriguez considered Sipe to be a "nice guy," and she stated that she never heard him use derogatory terms to describe aliens. She also heard Sipe say that he was under investigation for "knock[ing] an alien over the head with his flashlight," although she remembered no other details about the incident.

The government makes two arguments. First, the government denies that it "suppressed" Rodriguez's statements because

_____

[42] *Kyles*, 514 U.S. at 435 (1995).

32

Rodriguez was known to Sipe and he had every opportunity to obtain her statement and present her as a witness.  Second, the government argues that Rodriguez's statements were not truly "favorable" to Sipe; they were at best neutral.

We agree with the government on both fronts.  First, as we have noted, the State has no obligation to produce potentially exculpatory evidence that is either known to the defendant or that could be discovered through the exercise of reasonable diligence.[43] Sipe could have contacted Rodriguez himself, determined whether she could testify to his character, and put her on the witness stand. Rodriguez was a fellow student and a personal acquaintance of Sipe's.  There is no indication from the record that Rodriguez was hostile to Sipe or refused to speak with him.[44]  In fact, her statements to the prosecutors indicate that she would have supported him.  In similar circumstances, we have refused to find *Brady* violations because a defendant is deemed to have access to personal acquaintances and associates.[45]  Indeed, Sipe did call

---

[43] *Rector*, 120 F.3d at 558-59 (5th Cir. 1997).

[44] For this reason, Rodriguez was in a very different position from Cruce, who would arguably have been uncooperative.

[45] *See Fogg*, 652 F.2d at 559 (finding no *Brady* violation when the prosecution failed to turn over the grand jury testimony of individuals who were friends of defendant); *see also Friend v. Rees*, 779 F.2d 50 (6th Cir. 1985) (rejecting a defendant's claim that a witness's identity was concealed, noting that the witness "was surely known to Friend and her version was available to him upon his or his attorney's inquiry"); *United States v. Nicholson*, 525 F.2d 1233, 1239 (5th Cir. 1976) (noting, in rejecting a *Brady* claim, that "[i]t appears that appellants both knew the witnesses and could have examined them before trial").

Cesar Garcia, his EMT instructor, demonstrating that he had access to members of his EMT class. Sipe offers no explanation why he could not have discovered Rodriguez's statements through reasonable effort. For that reason, and given his obvious ability to learn of her statement through the exercise of reasonable diligence, Rodriguez's statements are not *Brady* material.

We also reject Sipe's argument that Rodriguez's statements were "favorable" to Sipe. Her statements are most fairly categorized as neutral evidence that the government had no obligation to produce.[46] While it is true she labeled him a "nice guy," this statement, by itself, is of such marginal utility that it can hardly be considered favorable; by itself, it does nothing to contradict the government's claim that he was disrespectful of aliens. Her most helpful statement was that she had never heard him use derogatory terms to describe aliens, but even this statement can hardly be called "favorable." After all, Rodriguez did not state that Sipe did *not* use those terms, only that she had not heard him use those terms. Her statement speaks only to her own lack of knowledge, not to Sipe's character. The favorableness prong of *Brady* requires more.[47]

---

[46] *See United States v. Johnson*, 872 F.2d 612, 619 (5th Cir. 1989).

[47] We have refused in the past to find far more beneficial evidence to be "favorable" under *Brady*. For example, in *Andrews v. Collins*, 21 F.3d 612 (5th Cir. 1994), we concluded that evidence that a witness was unable to identify the defendant was neutral rather than exculpatory. *See also United States v. Rhodes*, 569 F.2d 384, 388 (5th Cir. 1978) (holding that the prosecutor had no *Brady* duty to disclose that a witness could not positively identify the defendant).

34

Because Rodriguez's statements were neither suppressed nor favorable, they cannot be material under *Brady* and we will not factor them into our cumulative analysis of the impact of the various asserted *Brady* violations.[48]

4

The government's failure to provide Sipe with a complete description of the benefits accorded the testifying aliens -- Guevara, Sanchez, and Diaz -- is much more troubling. In response to Sipe's interrogatories, the government stated in writing that the aliens were allowed to remain and work in the United States pending trial and specified that "no other promises or advantages" had been given. That was not true. The aliens were given other, significant benefits, including Social Security cards, witness fees, permits allowing travel to and from Mexico, travel expenses, living expenses, some phone expenses, and other benefits. They were essentially given all, and more, of the benefits they were arrested for trying to obtain illegally – benefits so valuable that they took great risks to obtain them by crossing the border illegally.

The district court noted that Sipe "could have gathered this information, possibly," but nonetheless found that the government

---

Similarly, in *United States v. Dillman*, 15 F.3d 384 (5th Cir. 1994), we concluded that a witness's statement that she could not remember a meeting was neutral, not exculpatory evidence.

[48] *See Freeman*, 164 F.3d at 249.

suppressed it. The court relied heavily on the prosecutors' affirmative representation to Sipe that the only advantage given the aliens was permission to remain in the country and work. The court also concluded that the information would have been important to an effective cross-examination of the witnesses regarding further advantages given to them in order to induce them to remain in the country to testify.

On appeal, Sipe paints a sinister picture. He recites statements by prosecutors that the aliens needed to be "kept in orbit"; that the agents needed to maintain "close control" over the witnesses; that they must be kept "in pocket"; and that the aliens needed to be "re-commit[ted] to the cause." This evidence, which was withheld from Sipe, reveals that the aliens were dependant upon the government for their most basic needs, such as visiting and communicating with their families. Sipe urges that the sheer scope of the benefits would have provided him with powerful evidence to discredit their testimony.

For its part, the government asserts that the undisclosed information about the benefits the aliens received is immaterial. First, the government argues that the information regarding the benefits given to the aliens was readily available to Sipe, in large part because Sipe cross-examined the witnesses on the stand about the benefits they received. Second, the government notes that Sipe knew that the aliens were given some benefits: they were allowed to remain in and work in the United States pending trial.

That they were given additional benefits, like Social Security cards, witness fees, and travel fees, is only additional cumulative evidence of bias and thus immaterial under *Brady*.

Although materiality determinations under *Brady* are always difficult, we find this to be a particularly close question. On the one hand, we recognize that Sipe did know that the aliens were given some benefits to ensure their cooperation at trial, and he cross-examined them on the subject in an effort to impeach their testimony. Our focus then is upon the *additional* benefits that they were given. Sipe states in his brief that this evidence would allow him to impeach the three aliens for bias -- that the jury would conclude that the aliens' testimony was influenced by their interest in receiving the government benefits. But an argument can be made that Sipe could have accomplished this impeachment with the evidence he had. He was told that the aliens were allowed to stay in the United States and work pending trial. This information alone indicates that the aliens would have been eager to appease the prosecutors to ensure that they were allowed to remain in the country, and Sipe could have exposed this bias at trial. Sipe was thus able to attack the aliens' credibility on the very issue of their dependence on the government. As one of our sister circuits has noted, evidence which impeaches an already impeached witness is by definition cumulative; its suppression does not give rise to a

37

*Brady* violation.[49]  We have similarly noted that "'[s]uppressed evidence is not material when it merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'"[50]

On the other hand, the sheer scope of the benefits given the aliens, the disturbing evidence regarding the government's control over the witnesses, and the fact that Guevara changed his account of the incident after dealing with the prosecutors gives us pause. When coupled with the government's affirmative statements that "no other benefits were given," plus compelling evidence in the record that Sanchez and Diaz could not have seen what they claimed to see the night of the attack, we question whether Sipe was effectively able to attack the credibility of the alien witnesses or challenge the government's theory of the case.[51]  The undisclosed evidence is not merely cumulative of other evidence in the record; rather, it

---

[49] *United States v. Kozinski*, 16 F.3d 795, 819 (7th Cir. 1994) ("Evidence that impeaches an already thoroughly impeached witness is the definition of 'cumulative impeachment' evidence and its suppression cannot give rise to a *Brady* violation.").
Guevara, to be sure, was impeached on many matters, including his alleged theft of a woman's bag, his repeated illegal entries into the United States, and his struggle with BPA Smith.

[50] *Felder*, 180 F.3d at 213 (5th Cir. 1999) (quoting *United States v. Amiel*, 95 F.3d 135, 145 (2d Cir.1996)).

[51] In this respect, this case differs from *United States v. Villafranca*, 260 F.3d 374 (5th Cir. 2001), where we concluded that the government committed no *Brady* violation by failing to reveal the size of a bonus paid to an informant. *Villafranca* was based in large part on our observation that "[a]t trial, the defense was able to fully explore the meaning of the contract and the likely bonus at trial." *Id*. at 379.  Here, by contrast, Sipe could broach the general subject of their bias, but after being misled about the scope of the benefits given, he could not "fully explore" the source of their bias.

38

changes the tenor of the aliens' testimony, places their "cooperation" with the government in context and provides an explanation for Guevara's ever-changing account of the attack.

The government argues that the evidence cannot be material under *Brady* because it does not deal directly with the central issue in the case: whether Sipe used excessive force in arresting Guevara. Given the tangential nature of the evidence, and the fact that Sipe had some information with which to impeach the aliens, the government urges that we look past its failure to disclose. We cannot so easily ignore the government's lack of candor. Sipe made a specific request for information regarding benefits given to the testifying aliens. The government responded in equally specific terms, explaining that the aliens were "allowed to remain and work in the country pending the trial of David Sipe. No other promises or advantages have been given." We have remarked in the past that "reversal for suppression of evidence by the government is most likely where the request for it was specific."[52] Here, the government's affirmative misrepresentation that the aliens received no benefits effectively pushed Sipe off track, taking from him powerful evidence exposing the witness's bias.

---

[52] *Lindsay v. King*, 769 F.2d 1034,1041 (5th Cir. 1985); *James v. Whitley*, 926 F.3d 1433, 1439 (5th Cir. 1991) ("It may be proper to weigh in favor of the accused 'the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value.'"(quoting *Bagley*, 473 U.S. at 683 (opinion of Blackmun, J.)).

39

More importantly, the aliens' testimony formed the heart of the government's case. Guevara, the victim, testified at trial that Sipe attacked him even though he put up no resistance. Evidence that Guevara was given substantial benefits to fabricate his story would have had a profound impact on his already suspect credibility.[53] Guevara, after all, was not only an alien who had been caught illegally entering the country; he had also provided multiple versions of the attack. In at least one of the stories he told investigators, he completely exonerated Sipe. Similarly, the "eye-witness" accounts provided by Dias and Sanchez would be particularly vulnerable, especially when viewed together with evidence indicating that they could not have seen Guevara crouching in the dense reeds on a dark night.

5

The final pieces of evidence withheld from Sipe are photographs taken by government investigators of the scene of the attack. The photographs were taken on May 31, 2000, nearly two months after the attack, from the location where Guevara stated he was injured. Guevara himself is in the photographs, posing to demonstrate where he was located in the reeds.

The district court considered the suppression of the photographs to be a "minor issue," but nonetheless concluded that

---

[53] *James v. Whitley*, 926 F.2d 1433, 1439 (5th Cir. 1991) ("[I]t may be proper to weigh in favor of the accused 'the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value.'").

40

the *Brady* requirements were satisfied.  The court noted that the photos were in the possession of the government and that they were favorable as evidence that key witnesses could not have seen the attack as they claimed because of the tall reeds.  In particular, the court stated: "The reason I say [that the photos should have been made available to Sipe] is because the photographs actually contained the victim himself laying down trying to display as to where he was."[54]

Sipe argues that the photographs were valuable impeachment evidence because they depict the dense reeds that would have invariably obscured the eye-witnesses' view of the attack.  The government responds that it had no obligation to produce these photographs because Sipe could have taken them himself.  The crime scene was open and equally accessible to him.

The government's argument, however, ignores the full import of the photographs.  While it is certainly true that Sipe could have taken his own photographs of the crime scene, the photographs depict more than just the scene: they also contain Guevara's self-placement in the reeds.  This self-placement is assertive conduct; it expresses Guevara's recollection as to where he was located when Sipe discovered him -- i.e., that he was lying down surrounded by

---

[54] It is unclear whether the court's statement should be considered a factual finding.  That is, it is unclear whether the court found that Guevara's placement and posture in the photographs was meant to indicate where he thought he was located the night of the attack.  In any event, the government does not dispute the district court's characterization that Guevara was "laying down trying to display ... where he was."

tall reeds. The district court concluded as much, and the government has not challenged this finding.

That said, we agree with the district court that this evidence is a minor issue. The chief value of the photographs is that they demonstrate that visibility through the reeds was not good. They thus call into question whether Sanchez and Diaz could truly have seen what occurred that night, and they cast doubt on the government's charge that Sipe deliberately struck a submissive Guevara on the head. But Sipe could certainly have taken his own photographs of the scene to prove these points. The State bears no responsibility to direct the defense toward potentially exculpatory evidence that is either known to the defendant or that could be discovered through the exercise of reasonable diligence.[55] When viewed together with other evidence in the record, moreover, the photographs are merely cumulative. Guevara testified at trial that he was crouching on his knees, on all fours, surrounded by the reeds. The photographs, it seems, do little more than repeat this testimony in pictorial format: they depict Guevara crouching in the reeds. We conclude that the government's failure to produce the photographs did not violate *Brady*.

6

Because multiple *Brady* violations are at issue, the question we must address is whether the "cumulative effect of all such

---

[55] *Rector*, 120 F.3d at 558-59.

42

evidence suppressed by the government . . . raises a reasonable probability that its disclosure would have produced a different result."[56] We include in this cumulative materiality analysis only the evidence that survived *Brady*'s other prongs: (1) Cruce's statement of dislike; (2) Murillo's acquittal on the charge of filing a false police report; and (3) information regarding additional benefits given to the testifying aliens.

Taken together, this evidence would have allowed Sipe to attack the government's case from every angle. Cruce, the government's star witness, could be impeached on his personal dislike for Sipe. The aliens could be grilled on the benefits they received from the government in exchange for their testimony. Guevara, in particular, could be attacked for his changing story. Even Murillo, a witness whom the government presented as a good citizen who came forward to do his civic duty, could have been undermined by revelations that he had, in the past, been accused of filing a false police report. Individually, some of this evidence troubles us. When this evidence is considered cumulatively, its potential impact on the outcome of the trial is too strong, especially given the other evidence in the record undermining the government's case. The cumulative effect of this evidence raises a reasonable probability that its disclosure would have produced a different result.

---

[56] *Kyles*, 514 U.S. at 421-22; *Freeman*, 164 F.3d at 248.

43

At the very least, this evidence would have seriously unsettled an already weak case. The evidence against Sipe, while sufficient for conviction, was not strong. Indeed, the government itself admitted that its case was difficult, in no small part because it relied on the testimony of an illegal alien who had changed his story and two alien witnesses who likely could not have seen what they claimed to see. If the jury had heard the evidence that the government failed to disclose -- evidence that Cruce and the other agents disliked Sipe; that the prosecution attempted to maintain "close control" over the aliens to "keep the aliens in orbit" for trial; that the prosecutors had protected Guevara from arrest when he was detained after the incident -- the shortcomings in the government's case would have been more apparent.

We have considered with due respect the judgment of the district court, which unlike us, had the opportunity to hear the evidence firsthand, gauge the credibility of the witnesses, and assess the importance of the various items of withheld evidence based on its personal understanding of the trial record. We cannot blithely ignore the court's considered judgment.

Unquestionably, there is sufficient evidence to support a finding of guilt in this case. It is undisputed that Guevara suffered a cut on his scalp, and a jury could have found that a reasonable agent would not have believed it necessary to strike Guevara on his head. The government relies heavily on Sipe's use of a particularly large flashlight. Its argument throughout the

44

case contains the implication that hitting Guevara on the head with this light not only violates the rules of the Border Patrol; it was virtually a per se violation of the criminal law prohibition against the use of excessive force, making the withheld evidence wholly immaterial.

However, this implicit suggestion ignores one crucial fact: the law's insistence that for Sipe's acts to rise to the level of criminal conduct, they had to have been done wilfully and with a bad and evil purpose. Significantly, it was undisputed that when he came upon Guevara, Sipe had no other weapon he might effectively deploy. His pepper spray would have been ineffectual in the dense cane, and drawing his handgun or baton would have been difficult and potentially hazardous given that he was operating in the dark in with only one hand free. The question that the government must answer beyond a reasonable doubt is not whether Sipe needed to strike Guevara on the head; rather, the government must show that Sipe had an evil purpose in wilfully violating Guevara's constitutional rights. While sufficient to support a conviction, the facts of this case are also consistent with the conclusion that Sipe's use of force was a spontaneous act of poor judgment, done while operating at night in a potentially dangerous situation. Given the closeness of this case based solely on those facts presented at trial, the government's failure to disclose copious amounts of evidence casting doubt upon the credibility of almost all of the key witnesses severely undermines our confidence

in the outcome of this case. We must affirm the trial judge's order of a new trial.

### III

In granting Sipe's motion for a new trial, the district court was careful to note that it also did so "in the interest of justice."

Under Rule 33(a), a district court "may . . . grant a new trial if the interest of justice so requires."[57] A motion for new trial "is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial . . . should be invoked only in exceptional cases . . . ."[58] However, if "a court finds that a miscarriage of justice may have occurred at trial, . . . this is classified as such an 'exceptional case' as to warrant granting a new trial in the interests of justice."[59]

In granting Sipe's motion, the district court focused primarily on the *Brady* violations committed by the government. But, as the court's oral ruling on the matter reveals, there was far more in the mix than just the five items of evidence discussed above. Indeed, throughout the proceedings, the government's disclosures were inadequate. In many cases, the court discovered

---

[57] FED. R. CRIM. P. 33(a).

[58] *United States v. Robertson*, 110 F.3d 1113, 1120 n.11 (5th Cir. 1997) (citation and internal quotation marks omitted).

[59] *Id*. (citation and internal quotation marks omitted).

that the government had failed to reveal important information, but Sipe was no doubt prejudiced by the delay and hindered in his preparation for trial.

The Judge noted before granting the motion that he had never before in his twenty years on the bench ordered a new trial. Yet he sat through the trial, learned of the government's repeated nondisclosures and misrepresentations, and was troubled. While many of these nondisclosures do not satisfy *Brady*'s rigid materiality standard, they nonetheless convinced the district court that Sipe did not receive a fair trial.

That said, we need not and therefore do not decide if his decision could properly rest solely on the district court's exercise of discretion under Rule 33.

AFFIRMED AND REMANDED FOR TRIAL.

JERRY E. SMITH, Circuit Judge, dissenting:


The majority finds that the cumulative effect of three alleged *Brady* violations is enough to warrant a new trial.  Because at least one of these alleged suppressions does not violate *Brady v. Maryland*, 373 U.S. 83 (1963), the cumulative effect of the remaining two alleged violations, even if true, does not undermine confidence in the verdict.  I therefore respectfully dissent from the majority's well-intentioned affirmance of the order granting a new trial.


I.

The majority readily admits that the independent value of each of the alleged *Brady* violations is minimal.  The majority correctly notes that "[w]hen there are a number of *Brady* violations, a court must analyze whether the cumulative effect of all such evidence suppressed by the government raises a reasonable probability that its disclosure would have produced a different result" (citing *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995)).  Under this cumulative analysis, where even the majority concedes that this is an "extremely close question," there is no *Brady* violation that merits a new trial, in this important civil rights prosecution, because *Brady* was not violated by the government's failure to turn over the prosecution memorandum.  Absent that plank in the majority's

analysis, the remaining violations, which are minor in nature,[60] are flatly insufficient to warrant a new trial.

Because the majority places so much weight on the prosecution memo, I infer that in the absence of that purported violation, the majority would not require a new trial. Because, however, the memo was neither suppressed nor material to the central issue of the case, its non-disclosure cannot be said to constitute a *Brady* violation.


A.

For evidence to be considered suppressed for *Brady* purposes, it must not have been known to the defense or discoverable to it by the exercise of reasonable diligence. *See Graves v. Cockrell*, 351 F.3d 143, 154 (5th Cir. 2003). The allegedly violative evidence goes to a dislike of defendant Sipe by a prosecution witness, Cruce. Specifically, the prosecution memo states that "Cruce admits to disliking" Sipe. Therefore, for the non-disclosure of the memo to be considered a *Brady* violation, the defense must neither have been aware of the information it contained, nor have been able

---

[60] The majority admits that both the evidence of Murillo's prior acquittal on a charge of falsifying a police report and the non-disclosure of the benefits conferred on the alien witnesses are insufficient, by themselves, to warrant a new trial. As the majority states, Murillo's acquittal "could [not] possibly place 'the whole case in such a different light as to undermine confidence in the jury verdict,'" and it is a "particularly close question" as to whether the evidence of additional benefits to the witnesses was material.

to discover that information through the exercise of reasonable diligence.

In Cruce's grand jury testimony, of which defense counsel was admittedly aware, Cruce makes it more than obvious that he did not "get along with [Sipe] that well," at least in part because of Cruce's belief that Sipe had an abusive personality. Despite whatever colloquial disclaimers Cruce may have used to preface or later soften his testimony, it certainly was plain to all involved, including the defense, that there was hostility between Cruse and Sipe.

That the defense was cognizant of the problem is conceded by the majority, which points out that "the defense suggested that Cruce bore Sipe a personal animosity and seized on the moment to put Sipe in a bad light." It therefore is hard to understand how the majority then can vigorously assert that "[e]ven if Sipe was in some sense 'on notice' that Cruce did not like him, Sipe was *unable* to use this suspicion at trial"(emphasis added). In the same breath, the majority argues that the prosecution memo represented the defense's "*only* avenue of impeachment." Is the reader to believe that on the one hand, the defense "suggested that Cruce bore Sipe a personal animosity" at trial, while simultaneously believing that Sipe was "unable to use this suspicion at trial?"

Beyond the majority's admission that Sipe's defense counsel did in fact point out the ill will the witness bore toward Sipe, it

50

is equally obvious that even had the defense not addressed this matter at trial, it was either quite aware of Cruce's feelings or would have been aware in the exercise of reasonable diligence. When asked, in front of the grand jury, whether he would have coffee with Sipe, Cruce responded: "No. I really§§honestly, I don't get along with him that well. He kind of has an abusive personality, and I just have never gotten along with him. Not that I dislike him, but he's not somebody I associate with."

Despite Cruce's protestation to the contrary, it is evident from this statement that Cruce does not like Sipe. He states twice that he does not get along with Sipe, and once that Sipe has "an abusive personality." The grand jury testimony also relates Cruce's view that Sipe was "[s]ometimes rude" and was "aggressive" toward illegal aliens.

That testimony and the "revelation" in the prosecution memo are nearly identical in their effect on the reader. If I were Sipe's counsel, and those grand jury statements were disclosed to me, I would have a pretty fair sense that the declarant held my client in low esteem. How could anyone be surprised that Cruce does not like Sipe after learning that Cruce does not get along with him and regards him as abusive, rude and aggressive? The use of a qualifying claim of respect or affection when followed by a completely inconsistent criticism, such as Cruce's "[n]ot that I dislike him . . .," or one saying "with all due respect, that's the stupidest idea I've ever heard," cannot be taken at face value. It

51

is unlikely, at best, that anyone hearing those statements would come away convinced that the declarant has the respect or affection for the subject of the statement that his initial disclaimer implies.[2] Therefore, the prosecution memorandum cannot reasonably form the basis of a *Brady* violation.

B.

The evidence underlying a *Brady* violation must be material. *Graves*, 351 F.3d at 153. "The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." *Smith v. Black*, 904 F.2d 950, 967 (5th Cir. 1990), *vacated on other grounds*, 530 U.S. 930 (1992). Again, with respect to this prong of the *Brady* analysis, the majority's argument is contradictory on its own terms, and the prosecution memo was insufficiently material to find a violation of the *Brady* doctrine.

The majority asserts, as evidence of the materiality of the prosecution memo, that "[t]he government relied on Cruce to pull together and lend credibility to the testimony of these illegal aliens, painting him as the 'best judge of what is reasonable out there.' We have little doubt that his testimony was central to the

---

[2] This is sometimes described as the difference between the content of a statement and its "illocutive" force. *See generally* J.L. Austin, *How To Do Things with Words* (Harvard Univ. Press 1988); John R. Searle, *Speech Acts: an Essay in the Philosophy of Language* (Cambridge University Press 1990).

52

jury's determination that Sipe's actions were inappropriate." Yet, a few paragraphs later, the majority contends that "[a]fter all, Cruce's testimony was not the only or even the most important evidence offered against Sipe." Moreover, as the majority notes (quoting the district court), another witness, Murillo, not Cruce, "'kind of pulled it all together with regards to what [the government's] theory of the case was and the whole flavor of the case . . . .'"

The majority's reasoning is (with due respect) confused. Was it Cruce's testimony that pulled together and lent credibility to the government's case? Or was it Murillo's testimony that pulled it all together? Although it is conceptually possible for the testimony of both witnesses to have been central to the government's case, I cannot rely on the majority's conclusional assertions to that effect, especially when those assertions are so plainly contradictory.

Furthermore, because the prosecution memo has questionable value for impeachment purposes, it is not material. As Sipe suggests, a sense of personal dislike, separate from professional contempt, conceivably could be used as a witness impeachment tool. As a weapon for cross-examination, however, the admitted dislike would not have been highly effective.

In fact, a line of questioning based on Cruce's dislike would have allowed Cruce to describe *why* he disliked Sipe. His answers,

53

stemming from Sipe's poor professional behavior and character, would have detracted little from the credibility of his description of the facts of the alleged crime and would have done even more to make Sipe look bad before the jury.

This interpretation is bolstered by the fact that Sipe's attorney did not vigorously attempt to pursue this line of questioning, despite Cruce's admission before the grand jury that he did not "get along" with Sipe. Such a strategic decision speaks volumes about the attorney's understanding that it was more damaging to pursue that line of inquiry than to let it lie. There is no hint that Cruce had a vendetta against Sipe. Rather, Cruce's explanation of why he did not like SipeSSan explanation that was found in the grand jury testimony and the prosecution memoSSindicates that Sipe was a bullish, aggressive jerk.

That is precisely the picture the prosecution was trying to portray and the defense wanted to rebut. So, the whole notion that Sipe would have cross-examined Cruce more thoroughly on the basis on his "dislike" for Sipe is highly improbable. The assertion of dislike is indicative less of a latent bias than of the usual human reaction to an aggressive, obnoxious personSSa reaction that would likely have been strengthened in the minds of the jury had Sipe's attorney more vigorously pursued this line of questioning, armed with the prosecution memo. In short, under *Brady*, the prosecution memo was not material.

54

## II.

In summary, because the majority's decision is based on a careful weighing of the cumulative value of three pieces of supposedly material and suppressed evidence (a balance that the majority grants yields a very close call), it is obvious that any disturbance to these precariously balanced scales of justice would produce a different result.  As I have explained, the failure to produce the prosecution memo is not a *Brady* violation.  Consequently, the cumulative weight of the other two purported *Brady violations* (a weight that even the majority admits is not great) is insufficient to upset the verdict.  I respectfully dissent.